UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TERESA RODGERS,

               Plaintiff,                                      Hon. Gordon J. Quist

v.                                              Case No. 1:10-CV-434

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.

_____/


**REPORT AND RECOMMENDATION**

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 52 years of age on the date of the ALJ's decision.  (Tr. 24, 117). Plaintiff successfully completed high school and worked previously as a secretary.  (Tr. 22, 147).

Plaintiff applied for benefits on September 1, 2006, alleging that she had been disabled since October 27, 2004, due to depression, anxiety, fibromyalgia, arthritis, carpal tunnel syndrome, diabetes, hypertension, sleep apnea, restless leg syndrome, osteoporosis, idiopathic edema, syndrome X, and seasonal affective disorder.  (Tr. 117-22, 146).  Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 63-116).  On August 12, 2009, Plaintiff appeared before ALJ Denise Martin, with testimony being offered by Plaintiff, medical expert, Ellen Rozenfeld, Ph.D., and vocational expert, Lee Knutson. (Tr. 30-62).  In a written decision dated August 29, 2009, the ALJ determined that Plaintiff was not disabled.  (Tr. 11-24).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 1-4).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

3

## RELEVANT MEDICAL HISTORY

On May 13, 2003, Plaintiff participated in a rheumatoid factor examination the results of which were "negative." (Tr. 660). On July 31, 2003, Plaintiff participated in an ANA screen examination the results of which were "negative." (Tr. 654).

On October 21, 2003, Plaintiff participated in an EMG examination the results of which revealed "evidence consistent with mild chronic bilateral carpal tunnel syndrome, left slightly more involved than right." (Tr. 438). X-rays of Plaintiff's hands and wrists, taken on March 29, 2004, revealed "no significant interval change" when compared with x-rays taken in 1997. (Tr. 242). The x-rays also revealed "no [evidence of] marginal erosion" or "focal bone destruction." (Tr. 242).

On April 1, 2004, Plaintiff was examined by Dr. Robert Hylland. (Tr. 219). Plaintiff reported that her arthritis "is considerably improved" and she is "feeling dramatically better." (Tr. 219). A musculoskeletal examination revealed "minor" tenderness to palpation of the right knee and several joints of the left hand, but no evidence of inflammatory synovitis. (Tr. 219). An examination of Plaintiff's joints revealed that "7+" were "tender," but none were "swollen." (Tr. 219). The doctor reported that Plaintiff was "doing well" and recommended that she continue her present course of treatment. (Tr. 219).

On July 20, 2004, Plaintiff participated in an MRI examination of her brain the results of which were "within normal limits." (Tr. 250).

On November 9, 2004, Plaintiff was examined by Dr. Hylland. (Tr. 217-18). Plaintiff reported that she recently "quit" her job "because she found it very difficult to do some of the accounting work." (Tr. 217). A musculoskeletal examination revealed "no acute inflammatory

arthritis," but the doctor did observe "tenderness" in Plaintiff's right shoulder, right knee, wrists, and several joints in her hand.  (Tr. 217).  Plaintiff's medication regimen was modified.  (Tr. 217).

On September 13, 2005, Plaintiff was examined by Aaron Hunt, a physician's assistant working with Dr. Hylland.  (Tr. 213-14).  Plaintiff reported experiencing "some muscle fatigue that seems to be gradually worsening over the last several months."  (Tr. 213).  Specifically, Plaintiff reported "having difficulty walking for prolonged periods of time and also noticing true muscle weakness with most activities being more difficult for her, worse in the lower extremities, specifically across the thighs."  (Tr. 213).  Upon examination, Plaintiff exhibited "excellent strength in all muscle groups at five out of five."  (Tr. 213).  Hunt noted specifically that Plaintiff "is quite strong in the lower extremities with no deficit noted."  (Tr. 213).  Plaintiff reported that she rides a motorcycle "almost daily."  (Tr. 213).  Plaintiff's medication regimen was modified.  (Tr. 214).

On November 10, 2005, Plaintiff participated in a bone densitometry examination the results of which revealed she experienced osteopenia.[1]  (Tr. 248).

Treatment notes dated February 17, 2006, indicate that Plaintiff participated in physical therapy from October 26, 2005 through February 16, 2006.  (Tr. 258).  Upon discharge from physical therapy, Plaintiff reported that she experiences "minimal" pain in her lower extremities and "no longer has neck pain."  (Tr. 258).

On March 20, 2006, Plaintiff was examined by Physician's Assistant Hunt.  (Tr. 211-12).  Plaintiff reported that she "is thinking about applying for long-term disability."  (Tr. 211).  Hunt

---

[1]  Osteopenia refers to a condition marked by a deficiency of bone; the presence of less than the normal amount of bone. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* O-121 (Matthew Bender) (1996).  Osteopenia is distinct from, and less severe than, osteoporosis. *See* Osteopenia - Overview, *available at* http://www.webmd.com/osteoporosis/tc/osteopenia-overview (last visited on August 1, 2011).

5

responded that he discerned "no clinical evidence to permanently disable the patient, although there may be some reason for some work restriction, specifically with any heavy lifting or significantly repetitive motions in the hands or wrists, as she does have carpal tunnel."  (Tr. 211)

X-rays of Plaintiff's hands and wrists, taken on March 27, 2006, revealed "progressive osteoarthritis...of the first carpal-metacarpal articulation on the left" when compared to x-rays taken in March 2004.  (Tr. 241).  The x-rays did not, however, reveal "any other significant or specific arthritic changes."  (Tr. 241).

On September 11, 2006, Plaintiff participated in a diabetic retinopathy examination the results of which revealed "no diabetic retinopathy...in either eye."  (Tr. 295).

Treatment notes authored by Dr. Marjorie Mooney on November 7, 2006, indicate that Plaintiff "is not exercising or following a diabetic diet."  (Tr. 712).  The doctor also noted that Plaintiff "has intermittent problems with wrist pain, hand pain, knee pain and hip pain" and that "Celebrex is helpful but not always fully affective."  (Tr. 712).

On November 9, 2006, Plaintiff participated in an electromyography and nerve conduction examination the results of which revealed "evidence of a mild carpal tunnel syndrome on the right and a borderline carpal syndrome on the left."  (Tr. 285-86).

On March 8, 2007, Plaintiff participated in a consultive examination conducted by David Cashbaugh, Jr., M.A., LLP.  (Tr. 302-06).  Plaintiff reported that she was disabled due to "mostly anxiety and depression."  (Tr. 302).  Plaintiff also reported experiencing chronic fatigue syndrome and fibromyalgia.  (Tr. 302).  Plaintiff reported that she "likes to read" and "play with her grandchildren."  (Tr. 303).  Plaintiff reported that she also enjoys riding motorcycles and going to the movies.  (Tr. 303).  Plaintiff reported that she and her husband "belong to a motorcycle

6

association" and that she "helps" her husband with his duties as "chapter director."  (Tr. 303).

Plaintiff also reported that she talks with her friends on the telephone and "occasionally" meets them

for lunch or dinner.  (Tr. 303).

Plaintiff reported that on a scale of 1 to 10, her depression rates "at about a 7 most

of the time."  (Tr. 304).  Plaintiff reported that she gets "about 3" panic attacks each week and that

her anxiety level "most of the time [rates] at an 8 plus."  (Tr. 304).  As for her physical pain, Plaintiff

reported that her pain level is "about a 6 most of the time."  (Tr. 304).  Plaintiff brought her various

medications to the examination and after examining them Cashbaugh concluded that "looking at her

medications, the dates and amount of pills left, she does not appear overly medication compliant."

(Tr. 304).  Plaintiff appeared "quite anxious," but the results of a mental status examination were

otherwise unremarkable.  (Tr. 304-36).  Plaintiff was diagnosed with generalized anxiety disorder

and her GAF score was rated as 57.[2]  (Tr. 306).

On March 12, 2007, Plaintiff reported that "she does continue to have some problem

with anxiety but overall she feels she is functioning better" on her current medications.  (Tr. 373).

Plaintiff also reported that "her symptoms of depression improved."  (Tr. 373).

On May 15, 2007, Julie MacArthur completed a report concerning Plaintiff's ability

to perform mental work-related activities.  (Tr. 410-12).  MacArthur reported Plaintiff's ability as

"fair" in the following areas: (1) follow work rules; (2) relate to co-workers; (3) deal with the public;

and (4) use judgment.  (Tr. 410).  MacArthur rated Plaintiff's ability as "poor" in the following areas:

---

[2]  The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV).  A GAF score of 57 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning."  DSM-IV at 34.

(1) interact with supervisors; (2) deal with work stresses; (3) function independently; and (4) maintain attention/concentration.  (Tr. 410).  MacArthur reported that Plaintiff's ability to "understand, remember, and carry out detailed, but not complex, job instructions" was "fair."  (Tr. 411).  MacArthur reported that Plaintiff's ability to "behave in an emotionally stable manner" was "poor" and her ability to "relate predictably in social situations" was "fair."  (Tr. 411).  MacArthur concluded that Plaintiff's "anxiety/depression would severely impact work-related activities" and that "staff dynamics would overwhelm" Plaintiff.  (Tr. 412).

On May 17, 2007, Plaintiff was examined by Dr. Mooney.  (Tr. 372).  Plaintiff reported that she was experiencing right knee pain.  (Tr. 372).  Plaintiff exhibited "mild discomfort with flexion and extension of the right knee with slight crepitation with flexion and extension of the knee."  (Tr. 372).  The doctor also reported, however, "there is no evidence of any warmth or significant tenderness to palpation, there is no evidence of any lower extremity ulcerations."  (Tr. 372).  X-rays of Plaintiff's right knee, taken on May 18, 2007, revealed "minimal degenerative changes."  (Tr. 566).

On June 19, 2007, Dr. Mooney completed a report regarding Plaintiff's physical abilities.  (Tr. 413-17).  Dr. Mooney reported that Plaintiff can sit continuously for five minutes and stand continuously for ten minutes.  (Tr. 415).  The doctor reported that during an eight hour workday, Plaintiff can sit for less than two hours and stand/walk for less than two hours.  (Tr. 415).  Dr. Mooney reported that Plaintiff can "never" lift any amount of weight and can "never" twist, stoop, or crouch.  (Tr. 416).

X-rays of Plaintiff's chest, taken on September 11, 2007, were "stable" with "no significant acute intrathoracic abnormality."  (Tr. 560).  On September 12, 2007, Plaintiff

8

participated in a stress test the results of which revealed "no ECG evidence of ischemia or infarction." (Tr. 543-44).  On September 21, 2007, Plaintiff participated in a pulmonary function examination the results of which were "essentially within normal limits except the slight reduction in defusing capacity which is of doubtful clinical significance." (Tr. 537).  On September 21, 2007, Plaintiff participated in a CT scan of her thorax the results of which were "negative." (Tr. 559).

On October 2, 2007, Plaintiff was examined by Dr. Hylland. (Tr. 436-37).  An examination revealed that Plaintiff experienced "diffuse myofascial pain in 16 of 18 tender points." (Tr. 436).  The results of a rheumatoid factor examination were "negative." (Tr. 618).  Additional laboratory testing revealed "no evidence of a lupus-like anticoagulant." (Tr. 620).  Plaintiff's medication regimen was modified.  (Tr. 437).

On December 20, 2007, Plaintiff reported to Dr. Mooney that "her glucose has been controlled and she [has] no symptom of any hypoglycemia." (Tr. 356).  Plaintiff also reported that she was not experiencing "any shortness of breath or chest pain or discomfort." (Tr. 356).  Plaintiff also reported that her current antidepressant medication was "somewhat but not fully effective." (Tr. 356).

On November 15, 2007, Plaintiff reported to Dr. Hylland that her pain "responded nicely" to a recent change in her medication and her "pain dropped from 8.4 to 4." (Tr. 434).  A musculoskeletal examination revealed "minimal tenderness" to "palpation over the MCP and PIP joints in the wrists and on rotational motions of the shoulder." (Tr. 434).  There was, however, no evidence of inflammatory synovitis or Raynaud's phenomenon.[3] (Tr. 434).

_____

[3] Raynaud's phenomenon is a condition in which cold temperatures or strong emotions cause blood vessel spasms that block blood flow to the fingers, toes, ears, and nose.  *See* Raynaud's phenomenon, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001449/ (last visited on August 1, 2011).

Treatment notes dated December 3, 2007, indicate that Plaintiff was experiencing "obstructive sleep apnea syndrome" for which "CPAP has been helpful."  (Tr. 441-42).

On January 10, 2008, Plaintiff was examined by Dr. Mooney.  (Tr. 355).  Plaintiff reported that "she's definitely been doing better since her visit" and that "her back pain and arthralgias have definitely improved."  (Tr. 355).  Plaintiff also reported that "she is doing better in terms of her depression."  (Tr. 355).

On March 5, 2008, Plaintiff was examined by Dr. Hylland.  (Tr. 432-33).  Plaintiff reported experiencing myofascial pain.  (Tr. 432).  An examination revealed that Plaintiff was positive at "14 of 18 myofascial tender points," but "there is no inflammatory synovitis." (Tr. 432). The doctor concluded that "I am not seeing any inflammatory arthritis and her review is otherwise much that of myofascial pain, including insomnia, fatigue, headache, and diffuse aching." (Tr. 432).

On March 12, 2008, Plaintiff participated in an ANA screen the results of which were "negative."  (Tr. 612).  On April 18, 2008, Plaintiff reported to Dr. Mooney that her "pain is well controlled" on her current medication.  (Tr. 351).  X-rays of Plaintiff's chest, taken on May 14, 2008, revealed "no acute intrathoracic abnormality."  (Tr. 551).

On July 10, 2008, Plaintiff was examined by Physician's Assistant Hunt.  (Tr. 431). Plaintiff reported that she was "feeling fine" and the results of a musculoskeletal examination revealed "no synovitis."  (Tr. 431).  Hunt diagnosed Plaintiff with "inflammatory polyarthritis, stable."  (Tr. 431).

On July 17, 2008, Plaintiff reported to Dr. Mooney that "she has had increasing problems with anxiety."  (Tr. 345).  In response, Plaintiff's Cymbalta dosage was increased.  (Tr. 345).  Plaintiff also reported that she was having "no problems with any chest pain, shortness of

10

breath, lightheadedness or dizziness." (Tr. 345). Plaintiff also reported that her fibromyalgia was "fairly stable." (Tr. 345).

On September 29, 2008, Plaintiff participated in an opthamalogical examination the results of which revealed that Plaintiff's "eyes appear unaffected" by her diabetes. (Tr. 678-83). The examination revealed no evidence of diabetic retinopathy or neovascularization. (Tr. 682-83).

On May 22, 2009, Plaintiff was examined by Dr. Thomas Kuhn, with Holland Hospital Outpatient Behavioral Health Services. (Tr. 788-90). The doctor observed "few specific mood symptoms" and noted that Plaintiff "seems primarily interested in building a case for disability." (Tr. 788). Dr. Kuhn advised Plaintiff that "most people [with] depressive [symptoms] do better if they have work to do (structure, socialization, sense of accomplishment, etc.)." (Tr. 790). Plaintiff was diagnosed with adjustment disorder and her GAF score was rated as 65.[4] (Tr. 790). Plaintiff's medication regimen was modified. (Tr. 790). On June 22, 2009, Plaintiff reported to Dr. Kuhn that she was feeling "better." (Tr. 786). On July 21, 2009, Plaintiff reported that she was presently focusing on preparing for her upcoming disability hearing. (Tr. 782). Dr. Kuhn reiterated to Plaintiff that "from a depression standpoint it would be in her best interest to work." (Tr. 783).

As part of her evaluation of Plaintiff's disability claim, ALJ Martin requested that David Biscardi, Ph.D., offer his "professional opinion" concerning Plaintiff's claim. (Tr. 791-96). On June 16, 2009, Dr. Biscardi reported that Plaintiff experienced "moderate" restrictions of activities of daily living; experienced "moderate" to "marked" difficulties in maintaining social functioning; experienced "marked" difficulties in maintaining concentration, persistence or pace; and

---

[4] A GAF score of 65 indicates that the individual is experiencing "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

11

experienced "moderate" episodes of decompensation.  (Tr. 793).  The doctor further reported that Plaintiff's impairments did not meet or medically equal the criteria for any impairment described in the listing of impairments.  (Tr. 794).

On July 2, 2009, Dr. Adelita Alcala Saenz reported that she had "reviewed the Fibromyalgia Residual Functional Capacity Questionnaire completed by Marjorie Mooney, MD, dated June 19, 2007, and believe it accurately reflects Ms. Rodgers present capabilities and limitations as well."  (Tr. 774-79).

At the administrative hearing, Dr. Rozenfeld testified that Plaintiff suffers from anxiety and depression.  (Tr. 51).  The doctor testified that Plaintiff experienced mild to moderate restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and never experienced an episode of decompensation.  (Tr. 54-55).  The doctor testified that while Plaintiff was unable to perform "detailed, complex tasks," she can perform "simple, routine tasks."  (Tr. 54).

## ANALYSIS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffers from: (1) anxiety disorder, (2) depression, (3) carpal tunnel syndrome, and (4) fibromyalgia, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 13-15).  The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations.  (Tr. 22-23).  Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[5]   If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).   The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted, the Commissioner has established a five-step disability determination procedure.   While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v.*

---

[5] 1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.   An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.   If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.   If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

*Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

 With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work[6] subject to the following limitations: (1) she can occasionally balance, stoop, kneel, crouch, crawl, reach overhead, or climb ramps and stairs; (2) she can never climb ladders, ropes, or scaffolds; (3) she can frequently finger and handle objects, but must avoid constant repetitive movements of the hands and wrist; (4) she must avoid concentrated exposure to humidity, temperature extremes and vibration; and (5) she can perform simple, repetitive routine tasks without production quotas or deadlines in a low stress and not fast-paced environment. (Tr. 15).   After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

 The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.   *See Richardson*, 735 F.2d at 964.   While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).   This standard requires more than mere intuition or conjecture by the ALJ that the claimant

---

 [6] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."   20 C.F.R. § 404.1567.   Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday."   20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983); *Van Winkle v. Commissioner of Social Security*, 29 Fed. Appx. 353, 357 (6th Cir., Feb. 6, 2002).

can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Lee Knutson.

The vocational expert testified that there existed approximately 25,400 jobs in the State of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 57-59). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006).

### a.    The ALJ Properly Evaluated the Medical Evidence

Plaintiff asserts a single issue on appeal, that the ALJ failed to properly assess the opinions of several of her care providers. The ALJ's assessment of each care provider in question is discussed separately below.

### 1.    Dr. Mooney and Dr. Alcala Saenz

As previously noted, Dr. Mooney completed a report regarding Plaintiff's physical abilities on June 19, 2007. Dr. Mooney reported that Plaintiff can sit continuously for five minutes and stand continuously for ten minutes. The doctor reported that during an eight hour workday, Plaintiff can sit for less than two hours and stand/walk for less than two hours. Dr. Mooney also reported that Plaintiff can "never" lift any amount of weight and can "never" twist, stoop, or crouch.

On July 2, 2009, Dr. Alcala Saenz reported that she had "reviewed the Fibromyalgia Residual Functional Capacity Questionnaire completed by Marjorie Mooney, MD, dated June 19, 2007, and believe it accurately reflects Ms. Rodgers present capabilities and limitations as well." The ALJ, however, concluded that she "cannot give their opinions more than minimal weight, if any." (Tr. 19). Plaintiff asserts that because Dr. Mooney and Dr. Alcala Saenz were her treating physicians, the ALJ was required to accord controlling weight to their opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

16

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

The ALJ determined that the opinions expressed by Dr. Mooney and Dr. Alcala Saenz were entitled to little weight "given the lack of support for their opinions in their own treatment records and the marked inconsistencies between their views and those of the clinical specialists involved in the claimant's treatment." (Tr. 19). The ALJ further observed that "if the claimant's symptoms were as limiting as she alleges and Dr. Mooney believes, one would expect to see evidence of more aggressive treatment." (Tr. 19). As the medical evidence detailed above reveals, the results of numerous objective tests and examinations, performed over a lengthy period of time, are inconsistent with the opinions in question. Moreover, as the medical evidence also reveals, Plaintiff has been treated with conservative methods (e.g., medication and physical therapy) which have been fairly successful.

Plaintiff asserts that the ALJ improperly concluded that Dr. Mooney's opinion contained an inconsistency. The form that Dr. Mooney completed contains the following question,

17

"does your patient have *significant limitations* in doing *repetitive* reaching, handling or fingering?" (Tr. 416). In response to this question, Dr. Mooney selected "no." (Tr. 416). Immediately below this response, however, Dr. Mooney wrote that Plaintiff "cannot do this [due] to hand numbness and pain." (Tr. 416). The ALJ observed that these two responses appear somewhat inconsistent. (Tr. 19). Plaintiff nevertheless faults the ALJ for recognizing such, arguing that Dr. Mooney's responses indicate that she "had more than 'limitations' and that she was simply not capable of using her hands in a repetitive manner at all." (Dkt. #8 at 8). Plaintiff's after-the-fact rationalization is unpersuasive and, moreover, does not constitute evidence. Had Dr. Mooney wished to express the opinion that Plaintiff suffered from something more severe than "significant limitations," he should have articulated such. More importantly, the ALJ did not base her decision to discount Dr. Mooney's opinion solely on this apparent inconsistency. Instead, as previously noted, the ALJ's assessment was based her conclusion that the doctor's opinion was inconsistent with the medical record as a whole. Thus, even if the Court were to conclude that the ALJ erred on this particular point, such would not justify a different result.

Plaintiff also faults the ALJ for questioning the motives of Dr. Mooney and Dr. Alcala Saenz. In this regard, the ALJ concluded:

> Given the limited medical evidence and these inconsistencies, motives become an issue. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients (sic) requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current

> case particularly since treatment notes indicate improvement and
> better control of her symptoms.

(Tr. 19).

Plaintiff asserts that the ALJ committed legal error by calling into question the motives of Dr. Mooney and Dr. Alcala Saenz. Specifically, Plaintiff asserts that in *Blakely v. Commissioner of Social Security*, 581 F.3d 399 (6th Cir. 2009), the Sixth Circuit "rejected such an analysis of treating physician opinion articulated in the exact same language." While it is true that the *Blakely* court found error with an ALJ who analyzed a treating physician's opinion using language identical to that quoted above, the court's decision does not stand for the proposition herein asserted. The *Blakely* court did not hold that it is improper for an ALJ to examine a treating physician's motives, but instead faulted the ALJ in that case for rejecting a physician's opinion *solely* on the ground that the doctor's motives were suspect. *Id.* at 408. In the present case, the ALJ justified her rejection of the doctors' opinions by specifically noting that such were inconsistent with the doctors' own treatment records and the findings recorded by clinical specialists. The ALJ also noted that Plaintiff responded well to conservative treatment methods and was not treated with more aggressive methods. Thus, the present circumstance is distinguishable from that in *Blakely*.

In sum, substantial evidence supports the ALJ's decision to afford less than controlling weight to the opinions expressed by Dr. Mooney and Dr. Alcala Saenz.

2.      Julie MacArthur

As previously noted, on May 15, 2007, Julie MacArthur completed a report concerning Plaintiff's ability to perform mental work-related activities. MacArthur reported

19

Plaintiff's ability as "fair"[7] in the following areas: (1) follow work rules; (2) relate to co-workers; (3) deal with the public; and (4) use judgment.  MacArthur rated Plaintiff's ability as "poor" in the following areas: (1) interact with supervisors; (2) deal with work stresses; (3) function independently; and (4) maintain attention/concentration.  MacArthur reported that Plaintiff's ability to "understand, remember, and carry out detailed, but not complex, job instructions" was "fair."  MacArthur reported that Plaintiff's ability to "behave in an emotionally stable manner" was "poor" and her ability to "relate predictably in social situations" was "fair."  MacArthur concluded that Plaintiff's "anxiety/depression would severely impact work-related activities" and that Plaintiff would be "overwhelm[ed]" by "staff dynamics."  Plaintiff asserts that the ALJ failed to afford sufficient weight to MacArthur's opinion.

The ALJ "gave no weight" to MacArthur's opinion, finding that it was internally inconsistent and contradicted by other evidence of record.  (Tr. 20-21).  With respect to inconsistency, the ALJ observed that:

> Ms. MacArthur's statement is somewhat inconsistent - on one hand, the claimant could satisfactorily relate to others in the work setting, use judgment and follow work rules but on the other hand, "staff dynamics" would overwhelm the claimant.  Although she opines that the claimant cannot work, Ms. MacArthur indicates that she is capable of performing simple and detailed work tasks.

(Tr. 20).

The ALJ also observed that MacArthur's opinion was inconsistent with the results of David Cashbaugh's examination of Plaintiff conducted only two months prior to the articulation of MacArthur's opinion.  (Tr. 20-21, 302-06).  As detailed above, Plaintiff reported to Cashbaugh

---

[7]  The form that MacArthur completed defined "fair" as the "ability to function in this area is limited but satisfactory" and defined "poor" as the "ability to function in this area is seriously limited but not precluded."  (Tr. 410).

that she engaged in a variety of activities which are inconsistent with MacArthur's opinion. Cashbaugh further noted that Plaintiff "does not appear overly medication compliant." Cashbaugh rated Plaintiff's GAF score as 57 which is likewise inconsistent with MacArthur's opinion.

As the ALJ further observed, MacArthur's opinion was inconsistent with the treatment notes authored by Plaintiff's treating psychiatrist, Dr. Kuhn. Following a May 22, 2009 examination, Dr. Kuhn reported that he observed "few specific mood symptoms" and noted that Plaintiff "seems primarily interested in building a case for disability." Plaintiff was diagnosed with adjustment disorder and her GAF score was rated as 65, which is inconsistent with MacArthur's opinion. Dr. Kuhn modified Plaintiff's medication regimen and recommended to Plaintiff that she work. Plaintiff subsequently reported that she was feeling "better." Dr. Kuhn subsequently reiterated to Plaintiff that "from a depression standpoint it would be in her best interest to work."

In sum, there exists substantial evidence to support the ALJ's determination to discount the opinion expressed by Julie MacArthur.

c.    Dr. Nancy Devine

As part of her request to obtain review of the ALJ's decision, Plaintiff submitted to the Appeals Council additional evidence which was not presented to the ALJ. (Tr. 809). The Appeals Council received the evidence into the record and considered it before declining to review the ALJ's determination. (Tr. 1-4). This Court, however, is precluded from considering such material. In *Cline v. Commissioner of Social Security*, 96 F.3d 146 (6th Cir. 1996), the Sixth Circuit indicated that where the Appeals Council considers new evidence that was not before the ALJ, but nonetheless declines to review the ALJ's determination, the district court cannot consider such

evidence when adjudicating the claimant's appeal of the ALJ's determination.  *Id.* at 148; *see also*, *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007) (quoting *Cline*, 96 F.3d at 148).

If Plaintiff can demonstrate, however, that this evidence is new and material, and that good cause existed for not presenting it in the prior proceeding, the Court can remand the case for further proceedings during which this new evidence can be considered.  *Cline*, 96 F.3d at 148.  To satisfy the materiality requirement, Plaintiff must show that there exists a reasonable probability that the Commissioner would have reached a different result if presented with the new evidence.  *Sizemore v. Secretary of Health and Human Serv's*, 865 F.2d 709, 711 (6th Cir. 1988).

This additional material consists of an October 26, 2009 letter authored by Dr. Nancy Devine.  The doctor reported that she recently began treating Plaintiff for depression, anxiety, and fibromyalgia.  The doctor reported that Plaintiff's "condition is worse today than it was when she first applied for disability four years ago."  However, there is no indication that Dr. Devine possesses any firsthand knowledge of Plaintiff's condition prior to October 2009.  Moreover, aside from asserting in conclusory fashion that Plaintiff's application for benefits is "warranted and legitimate," the doctor offers no opinion that calls into question the ALJ's decision.  It is not reasonable to assert that consideration of this material by the ALJ would have led to a different result.  Accordingly, the Court is precluded from considering this evidence and, furthermore, there exists no basis for remanding this matter for its further consideration.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence.  Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within such time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  August 16, 2011                                          /s/ Ellen S. Carmody
                                                                        ELLEN S. CARMODY
                                                                        United States Magistrate Judge